UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------X

DOE RUN PERU S.R.L.,

        Applicant,

        v.

TRAFIGURA A.G.,

        Respondent.

------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PETITION AND APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. §1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS**

I.      **INTRODUCTION**

Pursuant to 28 U.S.C. § 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation." Courts typically address Section 1782 applications on an *ex parte* basis. *See, e.g., OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 3:09 MC 265 JBA, 2009 U.S. Dist. LEXIS 109492, *16 (D. Conn. 2009) (granting *Ex Parte* Application for Service of Discovery); *In re Application of Aldunate*, 3 F.3d 54, 62 (2d Cir. 1993) (affirming the district court's grant of appellee's *ex parte* application for discovery pursuant to Section 1782). Accordingly, Doe Run Peru S.R.L. ("DRP") hereby applies for an order permitting issuance of a subpoena (Ex. A) requiring production of significant documentary evidence that is directly relevant to the defamation action that a representative of DRP brought against representatives of Consorcio Minero S.A. ("Cormín") and Trafigura Group ("Trafigura") in the Criminal Court in and for Lima (the "Libel Action")(Ex. B).[1] The Judge in the Libel Action has called DRP's representative to render his deposition before the Judge on May 30, 2011 and the representatives of Cormín and Trafigura have been called to render their depositions on June 1, 2, 6, 7, 8, and 9, 2011. Because of the fast-moving nature of the Libel Action, DRP seeks this order on an expedited basis. *See* Huyhua Aff. at ¶¶2 & 3.

The Libel Action arises out of the intentional scheme of Trafigura, including the Peruvian presence of the Trafigura Group, Consorcio Minero S.A. ("Cormín") – competitors of DRP – to

---

[1] Unless otherwise indicated, all Exhibit references are to Affidavit of Juan Carlos Huyhua ("Huyhua Aff.") filed concurrently herewith. The subpoena attached as Exhibit A to the Huyhua Decl. is issued to Trafigura A.G., Inc. ("Respondent"), which is located in Stamford, CT. Respondent is the United States presence of Trafigura. *See* Ex. C (Trafigura Brochure) at 3.

close down and liquidate DRP, which owns the La Oroya Metallurgical Complex (the "Complex") and the Cobriza Mine located in Peru. The scheme involves, *inter alia*, a series of calculated defamatory statements by Cormín and Trafigura that are designed to destroy Doe Run Peru's reputation. Cormín and Trafigura for their own benefit devised and implemented a plan, possibly in coordination with other interested parties, whereby Cormín commenced an involuntary bankruptcy proceeding against DRP in February 2010 and engaged in conduct, described in detail below, aimed at closing DRP permanently. Acting in concert with Trafigura, Cormín, through its defamatory statements in the courts and in the press, seeks to destroy DRP's reputation with the intent of destroying the rights of it's shareholder, Doe Run Cayman Ltd. ("DRC") and to cause the liquidation of DRP's business. Specifically, through the making of its false and malicious statements, Cormín and Trafigura seek to cause DRC to be excluded from DRP's Creditors' Committee meetings, with the ultimate objective of denying DRC the right to own and restart DRP's operations and to cause DRP's liquidation. *See* Huyhua Aff. at ¶ 4.

## II. FACTUAL BACKGROUND

### A. DRP's Acquisition of the Complex

The Complex is comprised of smelters, refineries, and related equipment that process the poly-metallic minerals found in the central Andes region of Peru into copper, lead, zinc and other metals, including silver and gold. The Complex was founded in 1922 by Cerro de Pasco, and Peru nationalized the Complex in 1974, transferring ownership and control to the Empresa Minera del Centro del Peru S.A. ("Centromin"), a State-owned corporation. *See* Huyhua Aff. at ¶ 5.

In the early 1990's, Peru sought to privatize its mining industry, including the Complex. In 1997, Peru put up for sale to bidders the Empresa Metalurgica La Oroya S.A. ("Metaloroya")—the subsidiary of Centromin that owned the Complex. The bid was awarded to a consortium that included the Renco Group, Inc. ("Renco") and Doe Run Resources Corporation ("Doe Run Resources"). Renco and its affiliates are the owners of some of the largest mining, metals and manufacturing companies in the world, and they have a strong track record of achieving high environmental standards of operations and developing innovative new environmental technologies. Renco's chairman is Ira L. Rennert. *See* Huyhua Aff. at ¶ 6.

In accordance with the applicable laws, on October 23, 1997, Centromin, DRP, Doe Run Resources and Renco executed the Contract of Stock Transfer (the "Stock Transfer Agreement") for the purchase and sale of 160,507,779 shares of stock of Metaloroya. In the Stock Transfer Agreement, DRP agreed, *inter alia*, to (i) pay US$ 121,440,608 in exchange for the transfer of 160,507,779 shares of stock of Metaloroya; (ii) provide capital to Metaloroya in the amount of US$ 126,481,383.24; and (iii) invest the sum of US$ 120,000,000 over five (5) years. Section 3.3 of the Stock Transfer Agreement expressly provided that any funds initially contributed as capital could be withdrawn from Metaloroya and used for other investments. *See* Huyhua Aff. at ¶ 7.

DRP honored its agreement. It paid the price for the transfer of shares, in the amount of US$121,440,608, upon the execution of the contract. DRP also provided capital to Metaloroya in the amount of US$126,481,383.24. As permitted by Section 3.3 of the Stock Transfer Agreement, on the same day DRP provided this capital, Metaloroya granted an interest free loan in the amount of US $125 million to a DRP shareholder, Doe Run Mining ("DRM"). Such loan was transferred to DRC. Finally, DRP honored its agreement to invest the sum of US $

4

120,000,000 over five (5) years. This investment was verified by an independent auditing firm and accepted and ratified by Centromin through a letter dated February 13, 2003. *See* Huyhua Aff. at ¶ 8.

### B.   DRP's Financial Difficulties and Bankruptcy Filing

As a result of several factors, including actions by the Republic of Peru and the termination of working capital facilities by DRP's banks on February 24, 2009, the Complex was ultimately forced to shut down on June 3, 2009. Trafigura and Cormín, competitors of DRP, benefited from this shut-down. With DRP shut down, DRP's suppliers began to seek other international traders to sell their concentrates. As a result of the increase of its business due to DRP's shut-down, Cormín/Trafigura had to increase its mineral storage space approximately 25%. *See* Huyhua Aff. at ¶ 9 & Ex. D.

Looking for solutions to restart its operating activities, DRP had been negotiating with its creditors, including Cormín and Trafigura, to settle its debts to them and obtain a working capital line. In the course of these negotiations, Cormín/Trafigura, among others, recognized the validity of the debt that DRP owed to DRC and requested that this debt be capitalized. *See* Huyhua Aff. at ¶ 10.

In late 2009 and early 2010, DRP engaged in negotiations with Gonzalo Andrade, the commercial manager of Cormín and a Trader at Trafigura, and others at Cormín and Trafigura, to attempt to settle DRP's debt to Cormín. DRP's offers of settlement were rejected by Andrade and others at Cormín and Trafigura. In February 2010, Cormín commenced an involuntary bankruptcy against DRP with the Bankruptcy Proceeding Commission of the National Institute for the Defense of Free Competition and the Protection of Intellectual Property ("INDECOPI").

5

In opposition to this commencement, DRP offered to pay its debt to Cormín in full. Cormín rejected this offer and INDECOPI proceeded with the bankruptcy proceedings. *See* Huyhua Aff. at ¶ 11.

On March 2, 2011, after careful consideration of all the evidence, INDECOPI recognized an outstanding debt of US$ 156,545,088.94 in favor of DRC. Accordingly, DRC was entitled to participate in the Creditors' Meeting originally scheduled by INDECOPI to take place on April 4 and April 7, 2011 in which the Creditors, including DRC, would decide whether to liquidate or reorganize the company. *See* Huyhua Aff. at ¶ 12.

Cormín and Trafigura deliberately interfered with that process. On March 24, 2011, Cormín filed a civil complaint with the Twelfth Civil Court Specialized in Commercial Matters requesting an *ex parte* order temporarily suspending any and all rights resulting from DRC's claims in the INDECOPI proceedings including DRC's right to speak and vote at the Creditors' Meeting. Cormín based it's civil complaint on the gross mischaracterization of a report, dated September 10, 2010, compiled at the request of Cormín by BDO that summarized certain of DRP's financial transactions (the "BDO Report"). On March 30, 2011, the court granted Cormín's request and issued the order it sought. As a result, INDECOPI determined that it had to suspend the Creditors' Meeting, and as a result, the uncertainty of the future of the Complex and all the inhabitants of La Oroya working for the Complex precipitated by the INDECOPI proceedings initiated by Cormín has been unnecessarily prolonged. *See* Huyhua Aff. at ¶ 13.

6

### C.  Press Releases, Publications on Internet, and Court Filings

In accordance with the wrongful scheme and conspiracy dictated by Trafigura and in a constant attempt to destroy DRC's rights as DRP's creditor, Cormín has misused the media and misled the public by publishing false defamatory statements that destroy the reputation of DRP. *See* Huyhua Aff. at ¶ 14.

On April 4, 2011, Cormín made several defamatory statements that were published in an article entitled "**SHAREHOLDERS OF DOE RUN ONLY INVESTED US$ 2 MILLION**" that the Andina news service published and disseminated and that was republished at www.andina.com.pe. That communication accused DRP's shareholders of criminal conduct. On the same date, the same statements were published at www.gestion.pe. On April 5, 2011, they were republished by *Gestión* newspaper, on page 9. *See* Huyhua Aff. at ¶ 15 & Ex. E. That article contained the following false and defamatory statements:

- "DRP's Shareholders invested US $ 2MM, despite their offer of US$ 250MM."

- "An audit of DRP's and its affiliates' balance sheet and financial statements by BDO Lopez de Romana, disclosed that the shareholders of the mining company only invested US $ 2MM of its own capital and not the US $ 250 MM it had committed to the State of Peru."

- "According to information furnished by Cormín, DRP's shareholders failed to provide US $ 125MM to said company, as a working capital facility to enable it to operate normally."

- "This money was never invested in the company, since it was immediately 'withdrawn' after it was provided by DRP's shareholder through a complex web of financial engineering."

- "'DRP's shareholders not only withdrew' the above mentioned capital, but also they now illegally claim that DRP should assume the payment of an additional US $ 139MM, which is the financing said shareholders assumed to purchase shares of the actual DRP.'"

7

- Cormín "mentioned that this practice violates all notions of legitimate and responsible foreign investment, and it is a fraudulent investment before the Peruvian State, the creditors and DRP's workers." *See* Huyhua Aff. at ¶ 15.

On April 8, 2011, Cormín disseminated a press release entitled **"THE TRUTH ABOUT DOE RUN PERU – RELATED DEBTS ARE ILLEGAL"**, which contained numerous false and defamatory statements that damaged DRP's commercial reputation. The press release was subsequently published in the *El Comercio, Gestión, La República*, and *Correo* newspapers. *See* Huyhua Aff. at ¶ 16 & Ex. F. That press release contained the following false and defamatory statements:

- "The Doe Run Group implemented an illegal and financially illicit structure, causing significant economic damage to the Peruvian State and other creditors."

- "Ira Rennet and its affiliates have only invested US $ 2 million of its own patrimony to purchase La Oroya."

- "He [Ira Rennert] illegal withdrew the US $ 126.5 million the same day he contributed said amount, via a loan to himself (to one of its affiliates). He obtained the US $ 121.5 million through loans from third parties. Through a series of surreptitious and fraudulent actions, those loans now have to be paid by Doe Run Peru per se."

- "Therefore, Ira Rennert, has only invested US $ 2 million of its own patrimony for the purchase of la Oroya, and last but not least, they illegitimately pretend that the acquired company should pay the debt from the privatization, when it is obviously Ira Rennert's debt."

- "Ira Rennert's pretension is to illicitly control DRP's Creditors Meeting with a fraudulent and invalid debt."

- "This debt (plus interest amounts to almost US $ 140 million), illegally credited to Doe Run Peru, which now it is pretending to use in the bankruptcy proceeding to give a majority vote to Ira Rennert and its related affiliates, once more defrauding all the rest of the company's creditors." *See* Huyhua Aff. at ¶ 16.

On April 18, 2011 Cormín filed a revised civil action against DRP and DRC in the Twelfth Civil Court Specialized in Commercial Matters falsely stating that DRP and DRC

8

implemented a series of complex financial transactions intended to embezzle and misappropriate funds belonging to Metaloroya S.A. and the Peruvian government. That civil complaint contains the following false and defamatory statements:

- "From the time Mr. Rennert is faced with the need to contribute the necessary funds to DRP, it becomes apparent that he did not intend to use his own money. It is for that reason that he puts into practice a meticulous and complicated strategy to misappropriate Metaloroya and finally cause Metaloroya to assume the price of such acquisition."

- "It is from this moment that the actions directly intended to defraud the Peruvian State and to cause the La Oroya Metallurgical Complex to be the final 'payer' of the purchase made by Mr. RENNERT started."

- "The Court will immediately realize the irregular nature of this transaction and its poorly structured scheme: the money that had to be contributed to Metaloroya <u>was immediately embezzled from such company; it was never used as working capital or for purposes inherent to Metaloroya's line of business.</u>"

- "This means that the money that, according to the obligations undertaken by DRP with the Peruvian State, had to be contributed to Metaloroya as working capital was immediately 'recovered' by Mr. RENNERT and used to pay his own debt (DRM's debt) derived from Loan A. In other words, Mr. RENNERT, indirectly, through his companies, embezzled a capital that lawfully belonged to Metaloroya and used it to pay DRM's obligations relating to the purchase of Metaloroya's shares. <u>In short, Metaloroya's money was unduly used to pay for the purchase of its shares, which was an obligation of DRM (and, finally, or Ira RENNERT)</u>. As the Court knows, this already constituted a violation of the Business Corporations' Act which, in its Section 106, prohibits companies from granting loans or guaranteeing the acquisition of shares issued by themselves."

- "Shortly thereafter, Mr. Ira RENNERT continued implementing mechanisms to materialize the fraudulent acquisition of Metaloroya (already merged with and into DRP)."

- "DRM owed US $ 125 million to DRP for the illegal loan received from Metaloroya and inherited by DRP as creditor upon the merger of Metaloroya with and into DRP. This money had to be incorporated to DRP's capital stock, but it was 'embezzled' by its shareholder, DRM, through the Metaloroya Loan."

- "Nevertheless, and more importantly, the capital embezzled from Metaloroya (currently DRP) through the Metaloroya Loan was never refunded and DRP remained as the formal creditor of DRM. Up to such moment, the purchase of Metaloroya and the investment obligations had not been paid by Ira RENNERT or his companies; they had been paid

- with money from third parties and with money that formed part of Metaloroya's capital stock. The business purchased continued to belong to the 'financier' of Ira RENNERT."

- "Subsequently, **on May 14, 2001**, the illegal appropriation of the capital stock of Metaloroya (already merged with and into DRP) materialized through the **merger of DRM with and into DRP**, causing an evident detriment to its workers and creditors."

- "Unbelievably and as if by magic, the money that had to be contributed to DRP's capital stock to carry out its purposes and activities disappeared. The misappropriation of Metaloroya's capital stock by Ira RENNERT (through his companies) had been consummated. Thus, the evasion of the obligation imposed by the Peruvian State to make an investment in Metaloroya was now completely evident."

- "Through the acts executed by DRRC and DOE RUN CAYMAN LIMITED, not only did these companies misappropriate the own capital of DRP (formerly Metaloroya) but they also illegally 'attributed' another's debt to DRP."

- "Based on the information contained in the findings of fact of this complaint, it is evident that, from the time such production unit was acquired by DRP, DRP and its related companies started to design and implement an unlawful financial and legal scheme aimed at defrauding the State, violating express corporate regulations, defaulting on obligations and, finally, taking possession of such production unit without making any payment, thereby leaving its creditors, particularly Cormín, completely unprotected."

- "We must point out to your Office that the other facts described in the Findings of Fact section of this complaint provide a clearer evidence of, and make more apparent, the unlawful purpose of the Outstanding Debt and the Promissory Note, inasmuch as, apart from violating imperative and public order regulations, the Outstanding Debt and the Promissory Note are aimed at <u>embezzling DRP's resources and causing DRP to dispose of them to assume and pay debts unrelated to its business activities</u>." *See* Huyhua Aff. at ¶ 17.

Further, on April 20, 2011, the "La República" newspaper, on page 15, published an article entitled "**DOE RUN DEFRAUDED THE STATE IN THE PURCHASE OF THE METALLURGICAL COMPLEX**" that republished Cormín's false and defamatory statement accusing DRP of defrauding the Peruvian government. *See* Huyhua Aff. at ¶ 18 & Ex. G.

The "La República" article published on April 20, 2011 contained the following false and defamatory statements:

10

- "Legal counsels to Cormín, Aurlio Loret de Mola and Jose Ugaz denounced that Doe Run Peru (DRP) swindled the Peruvian State in the purchase of the La Oroya Metallurgical Complex, whereby the country lost US $ 125 million." *See* Huyhua Aff. at ¶ 19.

Cormín's statements are false and are detrimental to the reputation of DRP. Specifically:

- DRP has complied with each and every one of its obligations set forth under the Stock Transfer Agreement dated October 1997, paying in cash the price of the shares and the capital contributions as well as making the committed investments, an accountable transaction which was duly approved by the Peruvian State.

- DRP paid US$ 247,000,000 (Two Hundred Forty Seven Million US Dollars) to purchase the shares of stock; US$ 121,000,000 (One Hundred Twenty One Million US Dollars) of which were paid to the Peruvian State in strict compliance with the Stock Transfer Agreement, this being contrary to the statements made by Cormín which stated that only US$ 2,000,000 (Two Million US Dollars) were invested from its net worth.

- DRP has reinvested a total of US$ 318,885,000 (Three Hundred Eighteen Million eight hundred eighty five thousands US Dollars) in environmental projects.

- Section 3.3 of the Stock Transfer Agreement specifically allows any capital invested in Metaloroya S.A. to be withdrawn from the company and used for any purpose. Under Section 3.3, "**THE COMPANY** [Metaloroya] will not be obliged to maintain in cash the amounts contributed to increase the stock capital of **THE COMPANY**, pursuant to Numerals 3.2 and 3.3, but such funds may be used for other purposes, commercial operations or others." Therefore, the loan to DRC is a proper use of the funds contributed to Metaloroya S.A. *See* Huyhua Aff. at ¶ 20.

DRC is a creditor of DRP. The transactions that led to DRC becoming the holder of its note from DRP were all valid and legitimate, and were not fraudulent. Based on that fact, INDECOPI has correctly and validly recognized DRC's claim. *See* Huyhua Aff. at ¶ 21.

The defamatory statements made by Cormín at the direction of Trafigura, like the involuntary bankruptcy filing, the filing of the civil complaint to enjoin DRC's claim and the filing of the revised civil complaint against DRP and DRC, are part of the plan devised and

11

implemented by Trafigura and Cormín, possibly in coordination with other interested parties, to destroy DRC's rights as a creditor and to cause DRP's liquidation. *See* Huyhua Aff. at ¶ 22.

### D. DRP Seeks Documents from Trafigura concerning Trafigura's and Cormín's Improper Plan to Liquidate DRP

DRP seeks discovery from Trafigura related to the plan, devised and implemented by Cormín and Trafigura, to liquidate DRP. Specifically, DRP seeks non-privileged documents from Respondent concerning (1) the institution, commencement and continuation of the INDECOPI proceedings in Peru; (2) the institution, commencement and continuation of any action in any Peruvian court against DRP, DRC or any of their shareholders or affiliates, including the two actions instituted by Cormín in the Twelfth Civil Court Specialized in Commercial Matters; (3) the BDO Report, including any documents concerning the engagement of BDO with respect to this report; (4) the legal opinion of Benites, Forno, Ugaz & Loudowieg, Andrade Abogados dated April 1, 2011 in the letter signed by Jose Carlos Ugaz Sanchez Moreno; (5) the article entitled "Shareholders of Doe Run Only Invested US$ 2 Million" that was published by the Andina news service on April 4, 2011 and republished by Gestion newspaper on April 5, 2011, including any documents concerning the decision that representatives from Cormín would make the statements that were contained in that article; (6) the April 8, 2011 press release entitled "the Truth About Doe Run Peru – Related Debts are Illegal," including any documents concerning the drafting of and the decision to issue that press release; and (7) the article entitled "Doe Run Defrauded the State in the Purchase of the Metallurgical Complex" that was published by *La República* on April 20, 2011, including any documents concerning any statements that representatives of Cormín made to *La República* and the decision to disseminate a copy of the April 19 court filing to *La República*.

In order for DRP to be able to establish its claim in the Libel Action, Trafigura cannot be permitted to stand behind the limited reach of the Peruvian Criminal Court in order to avoid providing DRP with the evidence that only Trafigura possesses outside of Peru.

## III.     SECTION 1782 ENTITLES DRP TO DISCOVERY

To obtain discovery under 29 U.S.C. § 1782, the applicant must satisfy the statutory requirements and consideration of the discretionary factors must weigh in favor of discovery. The discovery that DRP seeks meets the minimal showing required by § 1782 and is highly relevant to the international proceedings. DRP's request is narrowly tailored to obtain only documents relevant to the foreign proceedings.

### A.     The Documents Sought in DRP's Requested Discovery is Highly Relevant

Generally, the federal rules allow for broad discovery so parties may gain full knowledge of the issue of the case. *Hickman v. Taylor*, 329 U.S. 495 (1947). In *In re IKB Deutsche Industriebank AG*, the court explained the relationship between § 1782 and Federal Rule 26(b):

> Under *Section 1782*, discovery is as broad as that under *Rule 26(b)*. Under *Rule 26(b)*, discovery is allowed regarding "any matter relevant to the subject matter involved in the action." Thus, the principal requirement is that the information requested be relevant to the subject of the pending case. . . . In general, relevancy should be liberally construed. If there is a possibility that the discovery sought may lead to information relevant to the subject matter of the action, then the discovery should be generally allowed. Thus, the Court should be permissive in determining the relevancy of the discovery requests to the pleadings.

*In re IKB Deutsche Industriebank AG*, No. 09-cv-7852, 2010 U.S. Dist. LEXIS 35924, *13-14 (N.D. Ill. April 8, 2010) (internal citations omitted).

DRP is only seeking documents concerning the misconduct at issue in the Libel Action. The limited discovery sought by DRP here is focused and highly relevant to the international proceedings. DRP is only seeking documents about a very focused set of issues that all concern the misconduct at issue in the Libel Action. Trafigura and Cormín are implementing their plan through (1) press releases; (2) statements to the press; and (3) legal actions. The document requests are narrowly tailored to ask only for documents relating to those vehicles.

B.      **The Requested Discovery Meets the Statutory Requirements of Section 1782**

Discovery under 28 U.S.C. § 1782 is proper if: (1) directed at a resident of the District; (2) intended for use before a foreign tribunal; (3) based upon the application of a person interested in the foreign proceeding; and (4) it does not disclose privileged materials. The discovery DRP seeks in the present application satisfies each requirement.

First, Respondent resides within this district. Trafigura does business in the United States through Respondent Trafigura A.G., a corporation organized under the laws of Switzerland that maintains an office in Stamford, CT. *See In re Minatec Finance S.A.R.L. v. SI Group Inc.*, No. 08-CV-269 (LEK/RFT), 2008 U.S. Dist. LEXIS 63802, *13 (N.D.N.Y. August 18, 2008); *See* Huyhua Aff. at ¶23. It is not relevant to the statutory requirements of Section 1782 whether the documents being sought are found in the district; only the Respondent is required to be found here. *In re Gemeinshcaftspraxis Dr. Med. Schottdorf,* 2006 U.S. Dist. LEXIS 94161 (S.D.N.Y. Dec. 29, 2006) ("Section 1782 requires only that the party from whom discovery be sought be "found" here; not that the documents be found here. . . .The fact that documents are located abroad, itself, is of little concern. They can easily be shipped to [Applicant] in New York (or

perhaps accessed electronically)...."). Therefore, discovery of Respondent under Section 1782 is proper.

Second, the discovery DRP seeks is for use by a foreign tribunal, namely in the Criminal Court in and for Lima, Peru. Indeed, the proceeding before the criminal court in Peru is a paradigm example of the type of proceeding before a foreign tribunal contemplated by Section 1782. *See, e.g., Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004); *see also Chevron Corp. v. Berlinger*, 629 F.3d 297, 310-11 (2d Cir. 2011); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 160 (S.D.N.Y. 2010).

Third, as the petitioner in the Libel Action, DRP is an "interested person." *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."). Finally, the requested discovery is not privileged. DRP is expressly seeking only non-privileged documents. Accordingly, the statutory prerequisites for discovery under 28 U.S.C. § 1782 are met.

### C. Discretionary Factors Also Heavily Favor Section 1782 Discovery

The Supreme Court has directed district courts to consider four additional factors in exercising their discretion to grant a Section 1782 application: (1) whether the request is unduly intrusive or burdensome; (2) whether the person from whom discovery is sought is a party in the foreign proceeding; (3) the receptivity of the foreign tribunal to federal-court assistance; and (4) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions. *See Intel*, 542 U.S. at 264-65. As detailed below, each factor weighs heavily in favor of granting the requested discovery.

1. *The Requested Discovery Is Not Intrusive or Burdensome*

DRP seeks extremely limited discovery here: documents from the Respondent focused on a limited number of topics that all relate to the conduct of Cormín and Trafigura that are at issue in the Libel Action. There should be little burden to Respondent in providing this limited discovery to DRP. Furthermore, to the extent Respondent raises such a concern, "§ 1782 permits this Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed." *Minatec*, 2008 U.S. Dist. LEXIS 63802, at *29.

2. *The Peruvian Criminal Court Cannot Obtain the Discovery Sought Without the Assistance of this Court*

A second discretionary factor is whether the parties from whom discovery is sought are parties to the foreign litigation at issue. *Intel*, 542 U.S. at 264. Courts interpret this factor broadly. Even if the party from whom discovery is sought *is* related to a party in the foreign proceedings, courts focus on whether the foreign proceeding could obtain the materials without assistance from the American court. *In re Eli Lilly & Co.*, 2010 U.S. Dist. LEXIS 59121, *7 (D. Conn. June 15, 2010) (this factor "asks the court to evaluate whether the documents or testimony sought by the application are within the foreign tribunal's jurisdictional reach, and thus accessible absent resort to § 1782."); *see also In re Svitavy*, 748 F. Supp. 2d 522, 526 (E.D. Va. 2010). Here, the reach of the Peruvian criminal court extends only so far as the borders of Peru. There is no possibility for DRP to request that the Judge in the Libel Action order Trafigura Group to produce documents that are within its control but outside of Peru. DRP will not be able to get the documents it seeks from the parties to the proceeding in Peru.

### 3. *Peruvian Courts Have Not Objected to Federal Court Assistance Under Section 1782*

"Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998). Furthermore, "[i]nasmuch as relevant evidence is presumptively discoverable under § 1782, the burden of demonstrating offense to the foreign jurisdiction, or any other facts warranting the denial of a particular application, should rest with the party opposing the application. . ." *Id.*

Section 1782 has never been applied to an action involving Peru. Nor have the Peruvian courts ever expressly objected to U.S. assistance. Where there is no express declaration of objection by the foreign sovereign, courts may choose not to consider respondent's arguments that the foreign court would not be receptive. *In re Application of Euromepa S.A.*, 51 F.3d 1095, 1100-01 (2d Cir. 1995) ("a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."); *In re Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 U.S. Dist. LEXIS 94161 (S.D.N.Y. Dec. 29, 2006)("[P]roof resting on equivocal interpretations of foreign policy or law generally provides an insufficient basis to deny discovery."); *Minatec*, 2008 U.S. Dist. LEXIS 63802, at *23-24 ("There is no reason to assume that a country that has not adopted a discovery requirement as extensive as ours would be either offended or reject the assistance."). Thus, in the absence of any express declaration, this Court should decline to assume that the foreign tribunal would be offended by the 1782 assistance.

        4.    *This Application Is an Attempt to Obtain Probative and Relevant Evidence for a Foreign Proceeding, and in No Way Circumvents Foreign Proof-Gathering Restrictions.*

Section 1782 does not require that the information sought be discoverable under the procedures of the foreign tribunal. *Intel*, 542 U.S. at 253; *Marubeni*, 335 Fed. Appx. at 98. Rather, in determining whether an application amounts to an effort to circumvent foreign proof-gathering restrictions, the issue for a district court is whether the discovery is being sought in bad faith. *Minatec*, 2008 U.S. Dist. LEXIS 63802, at *26 ("The primary issue for us is whether [Applicant] is pursuing this discovery in bad faith.").

DRP's request for documents and information relating to the misconduct at issue in the Libel Action is a good faith effort to obtain otherwise unavailable probative evidence as to significant issues in the Libel Action. DRP is unaware of any restrictions in the Libel Action that would prohibit the discovery it seeks.

Any relevant evidence developed would be admissible, within discretion of the Judge, under Peruvian law, in light of the fact that the parties have the right to present evidence and to challenge evidence presented against them. Article 139.9 of the Constitution of Peru regulates due process of law as a fundamental right that includes the right to present evidence and the right to defend against such evidence.

## IV. CONCLUSION

DRP's request is neither intrusive nor burdensome. DRP seeks only documents about narrow topics that focus on the misconduct at issue in the Libel Action. "Consistent with the statute's prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery material sought pursuant to

§1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *In re Bayer* AG, 146 F.3d at 195.

For the foregoing reasons, DRP respectfully requests that the Court enter an Order, pursuant to Rules 26, 30 and 45 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1782, granting it leave to serve the subpoena attached as Exhibit A to the Huyhua Declaration and attached as Exhibit 1 to the Application.

Dated: May 19, 2011

APPLICANT,
DOE RUN PERU S.R.L.
BY CUMMINGS & LOCKWOOD LLC
ITS ATTORNEYS

By: _____
John W. Cannavino (ct06051)
Timothy M. Herring (ct26523)
Six Landmark Square
Stamford, CT 06901
Telephone: 203-351-4677
Fax: 203-708-3892
E-mail: therring@cl-law.com

Edward G. Kehoe
Lisa Albert
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222